[L. A. No. 18882.   In Bank.   Nov. 6, 1944.]

DAVID A. FALL, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Philbrick McCoy, George K. Ford and Robert E. Ford for Petitioner.

Clifton A. Hix, Milo S. Smith, Hugh Rotchford, Royal S. Riddle and Joseph E. Madden as Amici Curiae on behalf of Petitioner.

Robert E. Jenson for Respondent.

THE COURT.—By writ of review, the petitioner has challenged a recommendation of disbarment made by the Board of Governors of The State Bar after the adoption, with certain modifications, of the findings of fact of a local administrative committee. The petitioner contends that the findings, as amended, are not sustained by the evidence and that they do not support the conclusion of professional misconduct justifying discipline.

The petitioner, admitted to practice in 1928, maintains offices at San Pedro. The charges of The State Bar are based upon acts assertedly done by him as attorney for the executrix of an estate being administered in San Diego County, and which it is alleged, constitute a violation of rule IV of the Rules of Professional Conduct of The State Bar and sections 6068a, 6068d, 6103, 6106 and 6128 of the Business and Professions Code. The notice to show cause declares that Fall misled his client with respect to the amount of the fee he would charge to represent her in matters of financing and closing

the estate, and also that by false representations he obtained an asset of the estate in settlement of his fee. By this means, it is said, Fall acquired an interest in property of the estate adverse to his client. A further accusation against him is that he knowingly misled a judge of the probate court by a false statement of fact. An amended order to show cause states, as an·additional ground for discipline, that petitioner gave false testimony in this proceeding.

The original notice to show cause was issued in December, 1941, and hearings before a local administrative committee were commenced early in 1942. But because of injuries sustained by Fall, the proceeding was not concluded until April, 1943. The committee made extensive findings of fact, responsive to practically all of the charges. It concluded, in addition, that petitioner had been guilty of a violation of section 6068b of the Business and Professions Code in failing "to maintain the respect due to the courts of justice and judicial officers." Also, said the committee, he had displayed and evidenced a desire to enrich himself at the expense of his client and a disregard for his oath in the facility with which he testified as he thought would best suit his ends. It was also stated that Fall did not recognize any of his acts as unlawful or unethical. As discipline the committee recommended disbarment. The Board of Governors adopted in part the findings of the committee, and after amending them in twenty-three particulars favorable to the petitioner, also recommended disbarment.

The complaining witness against Fall is Laurel Busch Haweis. He is the third attorney who was employed by Mrs. Haweis as the executrix of the estate of her deceased husband. At the time she asked him to undertake the settlement of the estate, two other attorneys had successively failed to satisfy her. Because of asserted refusal to carry out the provisions of the will, a daughter of Mr. Haweis had petitioned the court to remove Mrs. Haweis as executrix and that matter was then pending.

According to the testimony of Mrs. Haweis, Fall told her that he could complete the administration of the estate within two or three months and that his fee would be $200 or $250. Fall insists that the question of fees arose when he told Mrs. Haweis that money would have to be raised to close the estate. At that time, Fall told the committee, he said his fees would

be fixed by the court and that he could not then estimate the sum to which he would be entitled because of uncertainty as to the amount of work necessary to close the estate.

Upon this contradictory evidence the committee found that Fall had agreed to negotiate a loan and complete the administration of the estate for $250. But the Board of Governors struck out that finding, and as the record now stands, it shows only that Fall was retained by Mrs. Haweis to represent her as executrix. Presumably, the Board of Governors believed Fall's testimony that he made no agreement as to fees and accepted employment upon the understanding that his compensation would be fixed by the court.

The charge that Fall acquired an interest in property which was adverse to that of his client concerns a note and deed of trust which were assets of the estate. The note was made in 1932 by Samuel A. Shibley and wife for the principal sum of $4,000 with interest at the rate of 8 per cent per annum. At the time of Fall's employment by Mrs. Haweis, the total amount of principal and interest due and unpaid upon the note was approximately $7,000. Although the note was originally appraised as being worth the amount of principal and accrued interest, unquestionably its real value was quite problematical, for the Shibleys were claiming the benefit of the statute of limitations and also asserted that the note had been cancelled by Mr. Haweis. Moreover, the value of the land securing the note had depreciated to the extent that it was very doubtful whether any substantial amount could have been realized upon a trustee's sale. At one time Mrs. Haweis did not intend to make any attempt to enforce the obligation, for the record shows an admission by her that, shortly after her husband's death, she had so advised the debtors.

But within a short time after Fall became the attorney for Mrs. Haweis, she endorsed the note and assigned the deed of trust to him. According to his testimony, these transfers were made to carry out an agreement, reluctantly made by him after much persuasion by Mrs. Haweis, to accept the obligation in payment of his services. The testimony of Mrs. Haweis is directly to the contrary. She declared that when Fall offered to take the note as his attorney's fee, stating that it was worth "but a couple of hundred dollars," she told him it "would remain as part of the estate." The findings of the committee follow the testimony of Mrs. Haweis and

include the statement that Fall represented the value of the note as being not to exceed $200, well knowing that at the time the makers were willing to settle "for the sum of $2,500." The value adopted by the committee is based upon the somewhat uncertain testimony of George Shibley, an attorney and son of the debtors, in which he told of negotiations with Fall for a settlement of the matter. Very evidently this testimony did not satisfy the Board of Governors for it modified the findings, substituting for "the sum of $2,500," the phrase, "a substantial amount."

In her testimony, Mrs. Haweis not only charged Fall with misrepresenting the value of the note but also with securing her endorsement of it by representations that it was necessary for her to do so in order to commence foreclosure proceedings. She also testified that certain words of assignment were not on the instrument at the time she endorsed it. Although Fall at one time declared that no writing had been placed upon the back of the note after Mrs. Haweis wrote her name upon it, he afterwards admitted that he had written the words above the name of Mrs. Haweis on the day after she had signed the note, and also added an acceptance of the assignment by him.

The committee found that Fall had secured the endorsement of Mrs. Haweis upon the representation that "it was necessary that this assignment be made in order to have the trust deed foreclosed"; that at the time there was no writing by petitioner either above or below her signature, but that later, petitioner wrote in the language of assignment and an acceptance of it which he signed. The Board of Governors struck out the statement concerning the representations as to the purpose of the assignment, leaving no express finding as to whether the note had been transferred to Fall in payment of his fee. The committee also found that at the time petitioner wrote in the language above and below the signature of Mrs. Haweis, he knew that the note "was worth far in excess of the fee of $250.00 he had agreed to take as his fee to close the said estate, and knew . . . that he had an offer from the makers . . . to settle the same for a sum of $2500.00." As modified by the Board of Governors, this finding states that petitioner knew at the time he wrote in the language above and below the signature of Mrs. Haweis that the note was worth "far in excess of $200.00" and knew that the makers of the note "had indicated a willingness to settle the same for a sum substantially in excess of $250.00."

After Fall had obtained the assignment of the note and deed of trust, he continued negotiations with Shibley for the purpose of obtaining a settlement of the indebtedness. Whether Fall then disclosed to Shibley that the obligation had been transferred to him is uncertain. But a month after Mrs. Haweis had made the assignments, Fall requested the trustee under the deed of trust to execute and record a notice of default, describing the instrument as being an asset of the Haweis estate. He also prepared and mailed to the debtors a proposed agreement providing that $4,500 should be paid in full settlement of the matter.

Another month passed and Fall then filed in the probate court a reappraisement of the note and deed of trust showing the instruments, valued at $2,800, to be owned by the estate. Soon afterward he was advised by Shibley that the debtors had received an offer to sell the property secured by the deed of trust to one Foulks, and that an escrow had been opened to consummate the transaction. But, Shibley added, the estate would have to be closed in order to pass title to the property. Fall then agreed to obtain a reconveyance of the land by the trustee for which he demanded $4,000 less expenses. He admitted to the committee that he did not tell Mrs. Haweis "anything regarding having finally effected a deal with the Shibleys."

Fall then filed a petition for distribution in which the Shibley note was listed as property of the estate. There was no reference to the assignments made by the executrix and attorney's fees were not mentioned. At the time the petition came on for hearing, the negotiations with the Shibleys were still in progress.

Fall testified that when the matter was called, to his complete surprise, B. Kenneth Goodman, an attorney, stated to the court that he represented the executrix and objected to a distribution of the estate upon the ground that no provision had been made for attorney's fees. It appears that Mrs. Haweis had consulted Goodman without Fall's knowledge. According to Fall, he told the court that his fees had been settled, and the petition was thereupon granted.

Fall left the courtroom and in the hallway met Mrs. Haweis. She and Fall and Goodman then had a conversation. The testimony of Goodman is that he said, "Mrs. Haweis tells me she did not assign that trust deed and note," to which peti-

tioner replied, "She did, I believe I have them here." Goodman asked for copies and petitioner replied, "First of all I don't see why you should have them but I will send you copies of them."

In its finding with respect to these occurrences, the committee found that Fall's representations to the probate court were not true in that it was not a fact that his fees had been satisfactorily taken care of, but, as petitioner knew, he had agreed in accepting the employment to close the estate for $250 and Mrs. Haweis had not agreed to give him the Shibley note. The Board of Governors struck out this finding and it appears to be without substantial evidentiary support.

The testimony of Goodman is that at the time of the hearing upon the petition for distribution, Fall stated that the note was not worth more than $400 or $500 and that it would take one or more years to work out a settlement with the makers. But on the following day, said Goodman, he talked with Fall and requested a full explanation as to the escrow. Fall then told him of its condition, stating that he expected to receive $3,200. Goodman thereupon demanded that these facts be disclosed to the court. He also told Fall that he had advised Mrs. Haweis that there was no necessity for a substitution of attorneys in the estate, the administration having been completed except for the matter of fees.

Upon the insistence of Goodman, Fall filed a petition to have his fees determined and the assignment to him of the note and of the trust deed approved by the probate court. When the matter was heard the court made an order allowing petitioner an ordinary fee of $957.96, extraordinary fees of $1,100, $25 for toll charges advanced, and $521.78 for taxes paid, a total of $2,604.74. A confirmation of the assignment of the Shibley note was denied, but petitioner was given a lien upon it for the moneys due him. On the same day Fall wrote Goodman, Mrs. Haweis, and the court, requesting that a substitution of attorneys be filed and that an order be made staying distribution until the amount due him had been paid. In response to this request the court made an order staying distribution.

Meanwhile, Fall and Goodman had further conversations but they do not agree as to what was said by them. According to Fall, he delivered the files of the Haweis estate to Goodman and asked him if he would advise Mrs. Haweis to go through with the Shibley-Foulks deal. Goodman refused to do

so and Fall explained that he saw no other way of getting his fee. Goodman said that he would try to arrange for payment in installments from rental of the Beacon Inn, but that was not satisfactory to Fall.

In relating his version of what occurred, Goodman admitted that he told Fall there was no possibility of raising money for the fee from any source other than the pending sale, but claimed that Fall threatened to cite Mrs. Haweis for contempt. He also testified that Fall told him and, in fact, made the statement in the presence of the court, that the sale had fallen through; that Goodman's "meddling had thrown a monkey wrench in the deal, that it had fallen through and the purchasers had backed out." Goodman asked for their names so that he might see if the transaction could be concluded but Fall refused to give him any information concerning the buyers.

Unquestionably Fall represented to Goodman that the Shibley-Foulks escrow could not be closed but the asserted falsity of the statement is not satisfactorily shown by the record. On the contrary, there is substantial evidence which would justify Fall's assertion. Apparently for some time Shibley was quite uncertain as to whether the sale could be concluded and he testified that "We had quite a good deal of confusion and argument over his [Fall's] apparent failure to fulfill his part of the agreement under the escrow." He stated that Foulks "had been very apprehensive of the deal going through"; that the agent "told me and my mother that the Foulks were pulling out of the deal," and that Fall was so advised.

With the escrow still pending Fall decided to have a writ of execution issued upon the order allowing and fixing his fees. He claims that in doing this he acted upon the advice of the then presiding judge of the superior court. Whether a writ of execution may properly issue upon an order in probate fixing counsel fees appears to be an unsettled question. (See *Zagoren* v. *Hall*, 122 Cal.App. 460 [10 P.2d 202].) In any event, Fall procured such a writ and directed the Sheriff of Los Angeles County to levy upon the note and deed of trust, which were then in his possession, and to sell "all right, title and interest" of the Haweis estate. The sale was set for Monday, February 3d. Fall did not personally notify either Mrs. Haweis or Goodman of his actions; neither

did he give the clerk in the sheriff's office the address of Mrs. Haweis. He stated it did not enter his mind to do so, and she did not request it. The clerk, however, testified to the contrary. She said that she asked for the address of the executrix, so she might send notice of sale, and Fall told her that he did not have it with him, but would look it up and notify her of it.

Upon hearing this testimony Fall stated that it refreshed his memory and then said his reason for not giving the address of Mrs. Haweis was because he thought he would receive a substitution of attorneys from Goodman by mail. But, it will be recalled, Goodman testified that he had told Fall of his advice to Mrs. Haweis against such a substitution.

On January 28th the sheriff's office mailed a notice of sale in an envelope addressed to "Laurel Busch Haweis, Executrix, Estate of Emil J. Haweis, decd., C/O Clerk of Superior Court, San Diego, California." The clerk handling the writ told Fall that she was going to do this, and he agreed with her assumption that it was a sufficient address, saying, "It undoubtedly will reach her because by the time that gets down there the substitution of attorneys will be filed and the letter will be sent over to Mr. Goodman's office."

But no substitution of attorneys was filed, and the letter was forwarded to Fall's office. It arrived on Friday, January 31st, and the sale was set for the following Monday. Fall was in Los Angeles and found the letter when he returned to his office on Saturday morning. He readdressed it to Mrs. Haweis at "Beacon Inn, Cardiff by the Sea, Solano Beach, California" and mailed it about one o'clock in the afternoon of February 1st. Fall testified that he sent the notice to Mrs. Haweis at Solano Beach rather than to Goodman because he "knew there had been a mail delivery at Solano Beach on Sunday, that is the mail would arrive there and they posted the mail in the boxes on Sunday; that Mrs. Haweis had a habit of going to the post office on Sundays. I figured she would receive it on Sunday. Whereas, if it was sent to Mr. Goodman he couldn't possibly receive it until Monday."

The sale was held on Monday, February 3d, at the sheriff's office in Long Beach. Fall made no effort to reach Mrs. Haweis by telephone and ascertain whether she had received the notice. He explained that he was under no obligation to her; he had ceased on January 27th to be her attorney when Goodman announced in open court that he represented Mrs.

Haweis, as executrix; also, said Fall, his interest was adverse to that of Mrs. Haweis for she had said that she would see him "in hell" before she would pay him any of the money awarded by the court.

There was no bidder at the sale other than an agent of Fall who bought the note and deed of trust for $750. At about the same time that this was taking place, Mrs. Haweis received the notice which Fall had forwarded to her. She took it to Goodman who secured an order requiring petitioner to show cause why the writ of execution should not be recalled and the sale set aside. Fall filed an opposition wherein he averred that the offer to purchase the property was withdrawn because of the refusal of Mrs. Haweis and her attorney to cooperate; that he had paid obligations of the estate which made it necessary for him to realize immediately upon the order for the payment of his fees and advancements. The failure of Mrs. Haweis to receive timely notice of sale, he alleged, was due to Goodman's neglect to file the substitution of attorneys.

Upon a hearing, Fall was ordered to deliver the note and trust deed to Mrs. Haweis; upon compliance with the order a charge of contempt would be dismissed. The court also recalled the execution and declared the sale thereunder to be void. Some months later the controversy was settled by an agreement under which Fall received approximately $2,700 from the escrow and Mrs. Haweis was paid $900.

The findings of fact made by the committee, as approved and adopted by the board, after numerous amendments, declare that Fall's statement concerning the note he had taken for his fee being worth not more than $400 or $500 was made at a time when he knew that Foulks had agreed to buy the Shibley property for the sum of $5,750. Fall also knew that an escrow was then pending for the purpose of concluding the sale, and in this escrow he had filed a demand for $4,000. But some days later, Fall told Goodman that he was to receive $3,200 from the escrow as his fees. Fall permitted the notice of the execution sale to be addressed to the County Clerk at San Diego for the purpose of concealing from Mrs. Haweis the fact that the sale was to be held and in order to secure an advantage over her and the estate. And when the bid was made, Fall well knew that the note was worth in excess of $3,500.

Upon these findings, the committee concluded that the peti-

tioner had violated rule IV of the Rules of Professional Conduct, and the provisions of sections 6068a, 6068b, 6068d, 6103, and 6106 of the Business and Professions Code. In connection with its recommendation of disbarment, the committee declared that Fall "even now does not recognize any of his acts herein found to have been committed by him to be unlawful and unethical and that throughout his dealings with his client, he displayed and evidenced a desire on his part to enrich himself at the expense of his client and throughout his dealings, evidenced a scheme to possess himself of the property of the estate of the said Emil J. Haweis, to his own enrichment and further displayed to this committee a disregard for his oath in the facility with which he testified as he thought would best suit his ends, . . ."

In a disciplinary proceeding the findings of fact made by a local administrative committee or by the Board of Governors are not binding upon this court, which upon reviewing the recommendation for suspension or disbarment may, and always does, pass upon the sufficiency of the evidence. (*Light* v. *State Bar,* 14 Cal.2d 328 [94 P.2d 35]; *Furman* v. *State Bar,* 12 Cal.2d 212 [83 P.2d 12].) But assuming that the evidence requires findings that Fall made no misrepresentations to Mrs. Haweis either as to the value of the Shibley note or the purpose of assigning it to him, the record conclusively shows that when his client charged him with wrongdoing and demanded an accounting, without notice and in violation of the plainest principles of fair dealing, he endeavored to conclude a sale of the property which he had acquired from her. The evidence concerning the conduct of Mrs. Haweis reflects no credit upon her. Unquestionably she was a difficult and unappreciative client who had no scruples against obtaining legal services wihout paying an adequate amount for them.

However, after the court made its order withholding the confirmation of the assignments but giving Fall a lien upon the note for the amount of his fees and advancements, he had no right to deal with the instrument without regard to the interests of the estate, nor to deprive Mrs. Haweis of the opportunity of protecting that interest. In fairness to the estate and in submission to the order of the probate court, he was duty bound to collect upon the note only the amount of his lien.

Also, when Goodman, on behalf of Mrs. Haweis, demanded

an explanation of his acts concerning the Shibley note, Fall should have made a full disclosure concerning its probable value and the facts concerning the pending escrow. Having undertaken to justify his actions in connection with the property he had obtained from the estate, he was bound to give truthful information. Moreover, passing the question as to whether Fall was entitled to execution upon the order fixing the amount due to him as fees and advancements, having obtained the writ and levied upon the note, although he was not required to give Mrs. Haweis notice of the execution sale, his actions in concealing her address from the sheriff when it was requested by that officer evidences a total disregard of her rights and an intention to circumvent her by fair means or foul. Mailing a notice to her on a date so late that it was doubtful whether she would receive it, much less have time to act upon it for the protection of her interests prior to the sale, was contrary to the plainest principles of honesty and fair dealing. If the execution sale had not been set aside, Fall would have received about $900 more than the amount which the court had determined was due to him, and the order quashing the execution and setting aside the sale brands his actions as inequitable and unjustified.

██ "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise and whether the act is a felony or a misdemeanor or not, constitutes a cause for disbarment or suspension." (Bus. & Prof. Code, § 6106.) Moral turpitude, broadly defined, is conduct which is contrary to justice, honesty and good morals. (*Bryant* v. *State Bar*, 21 Cal.2d 285 [131 P.2d 523]; *Stanford* v. *State Bar*, 15 Cal.2d 721 [104 P.2d 635]; *In re Hatch*, 10 Cal.2d 147 [73 P.2d 885].) ██ One ground of defense urged by Fall is that he ceased to be the attorney for Mrs. Haweis when, at the time of the hearing upon the petition for distribution, Goodman appeared for her and objected to the making of a decree in the form proposed. But an attorney may be disciplined for conduct which involves moral turpitude committed outside of the professional relation, and Fall's actions clearly come within that category.

It is therefore ordered that David A. Fall be suspended from the practice of law for the period of one year, commencing thirty days after the date of the filing of this opinion.

CARTER, J.—I dissent. In my opinion the petitioner is "a man more sinn'd against than sinning," and if "moral turpitude" consists of something "contrary to justice," the majority decision of this court in this case is a literal exemplification of that definition.

The majority opinion apparently concedes that petitioner's dealings with Mrs. Haweis up to the time of her employment of Goodman as her attorney were entirely proper and that he made no misrepresentations to her in regard to the Shibley note and trust deed. The testimony of Mrs. Haweis that petitioner agreed to handle the financing problems and close up the estate for a fee of $200 or $250 is apparently disbelieved, as is her testimony with reference to representations which she claimed he made to her in regard to the trust deed and note.

The majority opinion states: "But assuming that the evidence requires findings that Fall made no misrepresentations to Mrs. Haweis either as to the value of the Shibley note or the purpose of assigning it to him, the record conclusively shows that when his client charged him with wrongdoing and demanded an accounting, without notice and in violation of the plainest principles of fair dealing, he endeavored to conclude a sale of the property which he had acquired from her. The evidence concerning the conduct of Mrs. Haweis reflects no credit upon her. Unquestionably she was a difficult and unappreciative client who had no scruples against obtaining legal services without paying an adequate amount for them."

It therefore appears that the principal criticism of the petitioner by the majority opinion relates to his conduct with respect to the sale of the note and trust deed under execution to satisfy his lien thereon without giving notice thereof to Mrs. Haweis or Goodman. However, the majority opinion also criticizes petitioner relative to his statements to Goodman in regard to the sale to Foulks of the property covered by the Shibley note and trust deed. In this regard the majority opinion states: "*Unquestionably Fall represented to Goodman that the Shibley-Foulks escrow could not be closed but the asserted falsity of the statement is not satisfactorily shown by the record. On the contrary, there is substantial evidence which would justify Fall's assertion.* Apparently for some time Shibley was quite uncertain as to whether the sale could be concluded and he testified that "We had quite a good deal of confusion and argument over his [Fall's] apparent failure to fulfill his part of the agreement under the escrow.' He

stated that Foulks "had been very apprehensive of the deal going through'; that the agent 'told me and my mother that the Foulks were pulling out of the deal,' and that Fall was so advised."

The majority must have resorted to the art of clairvoyance in making the foregoing deduction, that while there is substantial evidence in the record to support the truth of Fall's testimony, and there is no satisfactory evidence to the contrary, he nevertheless, *"unquestionably represented to Goodman that the Shibley-Foulks escrow could not be closed."*

But as I read the majority opinion the sole ground upon which it predicates its order that petitioner be disciplined is, that he caused execution to be levied upon the Shibley note and trust deed and had the same sold at execution sale without giving notice to either Mrs. Haweis or Goodman. This conclusion is reached notwithstanding the statement in the majority opinion that petitioner "was not required to give Mrs. Haweis notice of the execution sale." This, the majority opinion classifies as "moral turpitude" and justifies its order suspending the petitioner from practice for the period of one year.

I have made a careful examination of the record in this case, and the picture I get therefrom amply justifies the statement I made at the beginning of this opinion that petitioner is "a man more sinn'd against than sinning," and I can see no justification whatever for disciplining him for any conduct in connection with the Haweis estate or his dealings with Mrs. Haweis or Goodman.

The record discloses, and the majority opinion concedes, that petitioner undertook and performed services of substantial value in connection with the closing of the Haweis estate. No funds were available to pay for his services and he agreed to accept the Shibley note and trust deed which was of doubtful value, as full compensation for the services rendered by him. After these services had been rendered, Mrs. Haweis repudiated her agreement with him and attempted to prevent him from receiving the compensation to which he was entitled. Notwithstanding her testimony that he agreed to perform all of the services required in connection with the financing and closing of the estate for a fee of $200 or $250, the trial court allowed petitioner an ordinary fee of $957.96 and an extraordinary fee of $1,100, or a total of $2,057.96, ap-

proximately ten times the amount Mrs. Haweis said he had agreed to accept in full for his services. In addition to this allowance as fees, the trial court also allowed petitioner $25 for toll charges advanced and $521.78 for taxes paid by him, making a total of $2,604.74. Notwithstanding this order of the trial court, Mrs. Haweis exerted every effort to prevent petitioner from receiving the amount so awarded and employed attorney Goodman to assist her in preventing petitioner from obtaining the amount to which he was entitled. After attorney Goodman was employed by Mrs. Haweis, petitioner requested that he be substituted in petitioner's place as Mrs. Haweis' attorney, but Goodman refused.

The majority opinion concedes that petitioner had a legal right to levy execution upon the Shibley note and trust deed to satisfy his lien for attorney's fees and money advanced in connection with his handling of the Haweis' estate. The majority opinion likewise concedes that there is no law which required him to give Mrs. Haweis notice of the execution sale of said documents. In other words, the majority opinion concedes that when he proceeded to have execution issued and the Shibley note and trust deed sold to satisfy his lien thereon, he was doing what he had a legal right to do, and there can be no question but that this was his unassailable right. It is plainly obvious, and the majority opinion does not assert to the contrary, that from the time Goodman was employed by Mrs. Haweis as her attorney, the relation of attorney and client between her and petitioner terminated, and he was under no obligation to treat her as his client or extend to her any professional courtesy that should not be extended to an adverse party; in other words, from the time he undertook to collect from Mrs. Haweis his fee and the money which he had advanced, she was as to him an adverse party, and he was justified in treating her as such. Certainly, an attorney is under no obligation to notify an adverse party that he intends to levy execution on his property to satisfy a judgment against him, and the majority opinion does not assert the contrary.

I have always advocated and am a firm believer in high ethical standards in all professions, particularly in the legal profession, but I likewise believe that a professional man, including a lawyer, has some rights and that he is not required to yield to the avariciousness of a client who not only refuses

to pay just and fair compensation for the services rendered by his attorney, but attempts to discredit him without justification when the lawyer attempts to collect his fee. In the case at bar, the majority opinion states with respect to Mrs. Haweis: ''Unquestionably she was a difficult and unappreciative client who had no scruples against obtaining legal services without paying an adequate amount for them.'' And further, that she said: ''That she would see him (Fall) 'in hell' before she would pay him any of the money awarded by the court.'' To say that an attorney dealing with such a former client, after she has hired another attorney to represent her, is required to treat her differently from any other adverse party, is to my mind, placing a burden upon an attorney that was never contemplated by the State Bar Act or any rules of professional conduct ever promulgated by any responsible organization of lawyers or laymen. The majority opinion resorts to some fancy language in attempting to discredit the conduct of petitioner in connection with the execution sale of the Shibley note and trust deed. It states: ''Moreover, passing the question as to whether Fall was entitled to execution upon the order fixing the amount due to him as fees and advancements, having obtained the writ and levied upon the note, although he was not required to give Mrs. Haweis notice of the execution sale, his actions in concealing her address from the sheriff when it was requested by that officer evidences a total disregard of her rights and an intention to circumvent her by fair means or foul. Mailing a notice to her on a date so late that it was doubtful whether she would receive it, much less have time to act upon it for the protection of her interests prior to the sale, was contrary to the plainest principles of honesty and fair dealing.''

A complete answer to the foregoing chastisement is, that if petitioner was not required to give Mrs. Haweis notice of the execution sale, he did not disregard her rights in failing to do so. If she was not entitled to notice of the sale, as the majority opinion concedes, petitioner was under no obligation to give her such notice. Having been discharged as her attorney, and she having employed an attorney in his stead, petitioner was no longer interested in the protection of her interests; in fact, he was attempting to protect his own interests which he had a legal and moral right to do. In view of the factual and legal situation which existed at that time it is im-

possible for me to understand how it can be said that his conduct in connection with the execution sale "was contrary to the plainest principles of honesty and fair dealing." There is no claim or suggestion that he violated any trust or confidence reposed in him or used confidential information obtained while acting as her attorney.

The conclusion reached in the majority opinion is to my mind fanciful, unrealistic, unjust and in utter disregard of the facts and legal principles which the majority opinion concedes to be involved in this case.

I have some apprehension that lawyers who have had experience with clients of the type of Mrs. Haweis will feel, after reading the majority opinion, that it is the view of a majority of this court, that regardless of the conduct of the client, a lawyer has no rights which the client need respect. I do not agree with this view.

I am firmly convinced that there is no foundation whatever in either fact or law for the conclusion reached in the majority opinion and that the proceeding against the petitioner should be dismissed.

Schauer, J., concurred in the conclusion stated by Justice Carter.

Petitioner's application for a rehearing was denied December 4, 1944. Carter, J., and Schauer, J., voted for a rehearing.